NATURAL RESOURCES DEFENSE COUNCIL, INC.; Sierra Club; Wilderness Society; Defenders of Wildlife; Animal Defense Council; and Curt Spalding, Plaintiffs,

v.

Donald P. HODEL *, as Secretary of the United States Department of the Interior; Robert F. Buford, as Director of the Bureau of Land Management, United States Department of the Interior, Defendants.

No. Civ. S–84–616 RAR.

United States District Court,
E.D. California.

Sept. 3, 1985.

---

\* The Court substitutes Donald P. Hodel as successor to the original defendant, William P. Clark, pursuant to F.R.Civ.P. 25.

David B. Edelson, Johanna H. Wald, Natural Resources Defense Council, Inc., Laurens H. Silver, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., for plaintiffs.

Wells Burgess, George William Sherk, Land & Natural Resources Div. Dept. of Justice, Washington, D.C., Andrew M. Wolfe, Asst. U.S. Atty., Sacramento, Cal., for defendants.

Craig C. Thompson, Attorney General's Office, Sacramento, Cal., for amicus curiae.

## MEMORANDUM AND ORDER

RAMIREZ, District Judge.

The parties' cross-motions for summary judgment came on regularly for hearing before the undersigned on November 19, 1984. All parties were present and represented by respective counsel as was *amicus curiae*, STATE OF CALIFORNIA.[1] The parties have in effect submitted the case for trial upon an agreed record since neither plaintiffs nor defendants have alleged that genuine triable factual issues exist.

On May 9, 1984, plaintiffs (five environmental and wildlife organizations and one individual) filed a petition for review and complaint challenging the final rules and agency actions of the Secretary of the United States Department of the Interior, "the Secretary," and the Director of the Bureau of Land Management, "the BLM." Based on the various issues presented and the status of the parties involved, the Court finds that jurisdiction is properly predicated on the provisions of 28 U.S.C. § 1331.

## INTRODUCTION

The case before the Court is complex and involves issues of national importance and first impression.[2] The regulations under attack[3] are amendments to existing Department of Interior regulations with one common characteristic. Each pertains to the management of domestic livestock grazing on lands owned by the federal government and under the management jurisdiction of the BLM. Plaintiffs maintain in this action that defendants' rules and actions violate dozens of sections of several comprehensive federal statutes, including, but not limited to: the Taylor Grazing Act of 1934, 43 U.S.C. § 315, *et seq.;* the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1701, *et seq.;* the Public Rangelands Improvement Act of 1978 (PRIA), 43 U.S.C. § 1901, *et seq.;* the Administrative Procedures Act (APA), 5 U.S.C. § 551, *et seq.;* and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.* In substantial degree plaintiffs' positions are upheld in this opinion.

One issue which has dominated all others in the instant litigation is plaintiffs' challenge to the Secretary's so-called "Cooperative Management Agreements" (CMAs) by which defendants have permitted selected ranchers to graze livestock on the public lands in the manner that those ranchers deem appropriate.[4] For reasons stated in this opinion, the Court rules that the CMA program is contrary to Congressional intent and was enacted without proper regard for the possible environmental conse-

1. On October 10, 1984, the Court granted California Attorney General John Van de Kamp leave to participate as *amicus curiae* in support of plaintiffs' position.

2. As my brother in the Eastern District, Chief Judge Karlton, has observed: "Complexity does not lend itself to brevity without obscurity; how I wish it were otherwise." *Sierra Club v. Watt,* 608 F.Supp. 305, 344, n. 76 (E.D.Cal.1985).

3. On May 13, 1983, defendants issued a notice of proposed rulemaking amending the BLM's

regulations on livestock grazing administration. 48 Fed.Reg. 21,820 (1983). The final rulemaking was announced on February 21, 1984. *See* 49 Fed.Reg. 6440 (1984).

4. On August 21, 1984, defendants and plaintiffs stipulated that no additional CMAs would be executed until the instant litigation had been decided on the merits. Thus, there has been no need to decide plaintiffs' motion for preliminary injunction.

quences which may result from overgrazing on the public lands.

The Court holds that the CMA program is not a Congressionally authorized experiment with public grazing permits but is instead a *permanent* system which could eventually be extended to millions of acres of public grazing land in the western United States. The cooperative agreements unlawfully abdicate the Secretary's statutory duty to prescribe for ranchers the appropriate number of livestock which may be grazed on each public land allotment or the permissible grazing seasons. The agreements also fail to retain necessary governmental authority to enforce overgrazing prohibitions by cancelling, suspending, or modifying permits on abused public allotments. The regulation and program, consequently, violate the spirit and letter of federal laws which are intended to preserve and improve the ravaged commons through intensive management and ongoing governmental rights of reentry.

Plaintiffs are also entitled to summary judgment on their challenges to regulatory amendments aimed at reshaping United States policy regarding regional and local land use planning, livestock feeding, and penalties against ranchers who violate federal and environmental laws. Defendants, on the other hand, are entitled to summary judgment on the remainder of the regulations under challenge.

## I. PRELIMINARY ISSUES

### A. *Standing to Sue*

In cases challenging administrative decisions the federal courts may not embrace general public actions in which all comers attack controversial agency decisions. Following the letter of the Supreme Court's extensive teachings on the subject of standing, courts must strive to avoid the danger of immunization of agency action while at the same time ensuring that each litigant possesses a sufficient stake in the controversy to justify judicial intervention.

In cases such as the one at bar, a four prong standing test is required. The first two prongs are Constitutional prerequisites, based on the Article III command that federal courts only hear "cases and controversies." The third and fourth prongs involve prudential considerations of restraint which guarantee, among other things, that the litigation will proceed with sufficient adversary vigor.

Based on the foregoing, the complaint and record must demonstrate (1) plaintiffs' "actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); (2) a causal connection between the injury and the challenged action such that the injury is "likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); (3) "particularized" legal rights and interests as opposed to "generalized grievances" or claims merely based on the rights of third parties, *Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975); and (4) interests that arguably fall within the "zone of interests to be protected or regulated by the statute" in question, *Ass'n of Data Processing Services Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

■ In the present case, plaintiffs have satisfied each of the four mentioned requirements. The first requirement may be satisfied by alleging "threatened" as opposed to actual harm. *City of Davis v. Coleman,* 521 F.2d 661, 670–71 (9th Cir. 1975). Individual and organizational plaintiffs have alleged that they or their members use the public lands for recreational and aesthetic purposes and that the challenged regulations will have an adverse impact upon their use and enjoyment of these lands.

Plaintiffs have also unquestionably demonstrated that their alleged threatened injuries "fairly can be traced to the challenged action," and are therefore, "likely to be redressed by a favorable decision."

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Congress, in enacting legislation regulating the public lands has determined that the very values and interests which are alleged to be threatened are those sought to be protected by the legislation. It is not for this Court, therefore, to hold that enforcement of those laws can have no causal connection to the protection of those values and interests. Moreover, plaintiffs by seeking relief aimed at eliminating the cause of the threatened injury, have established a clear connection between the alleged harm and the action requested of the court.

To satisfy the third requirement, it is not necessary that plaintiffs' injuries are exclusive to themselves. So long as plaintiffs have asserted "distinct and palpable" harm to themselves, they may also "invoke the general public interest in support of their claim." *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206. The instant record details the specific nature of the alleged harm geographically and categorically. The allegations are not generalized or abstract but pertain to these particular plaintiffs.

Finally, plaintiffs have demonstrated that they are within the so-called "zone of interest" which Congress sought to protect by passage of laws pertaining to livestock grazing, environmental protection, and administrative process. Not only do the public land statutes mandate public participation, but they are aimed at preserving and protecting the aesthetic, environmental, and recreational values associated with public lands. Plaintiffs, as users of these lands, are certainly among the groups of citizens Congress intended to benefit when it required defendants to manage these lands by carefully regulating livestock grazing practices thereon.

In sum, plaintiffs, as users of the public lands and as participants in the administrative process, have established standing to challenge defendants' livestock grazing regulations, the procedure by which those regulations were promulgated, and the decision to enact them without first preparing environmental impact statements.

## B. Standard of Review

This Court is empowered, to the extent necessary to decide the issues herein presented, to hold unlawful and set aside any of the actions or rules of the Secretary or the BLM which are not in accordance with law. 5 U.S.C. § 706(2)(A). The Court should defer to the agency charged with the administration of the laws and sustain its interpretation of a complex statute even if it is not the only permissible construction. *Chemical Mfrs. Ass'n v. N.R.D.C.,* — U.S. —, —, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985). However, where the administrative interpretation "is contrary to the language chosen by Congress, and that language is not inconsistent with the congressional purpose," the Court must enforce the will of Congress and not that of the agency. *Lynch v. Rank,* 747 F.2d 528, 534 (9th Cir.1984). Since "the courts are the final authorities on issues of statutory construction," administrative constructions reached by rulemaking must be set aside if they are "inconsistent with the statutory mandate" or "frustrate the policy that Congress sought to implement." *F.E.C. v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981).

The principle of deference is particularly applicable to agency rules promulgated immediately following the enactment of a statute which represent a "contemporaneous construction" of the law by those "charged with the responsibility of setting the machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *ALCOA v. Central Lincoln Peoples' Utility District,* 467 U.S. 380, —, 104 S.Ct. 2472, 2480, 81 L.Ed.2d 301 (1984). On the other hand, "*post hoc* rationalizations by counsel for agency action are entitled to little deference" since it is the agency official and not its counsel "who possesses the expertise that can enlighten and rationalize the

search for the meaning and intent of Congress." *Securities Industry Association v. Board of Governors,* — U.S. —, —, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107 (1984).

In reviewing the Secretary's rules, and therefore his construction of the statutes governing the regulation of public lands, a two part analysis is required by the Supreme Court. First, if Congress has clearly spoken on the issue, the Court must "give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. N.R.D.C.,* 467 U.S. 837, —, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Second, if the statute "is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* The Court will not consider its own policy views or whether it believes the agency rule or other challenged action was the wisest choice available so long as it was "a reasonable choice within a gap left open by Congress." *Id.* 104 S.Ct. at 2793.

## II. LEGISLATIVE AND HISTORICAL BACKGROUND

The Secretary, through the BLM, is charged with managing more than 170 million acres of public rangelands throughout the western United States. Livestock grazing is authorized on about 150 million of these acres which are located primarily in Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.

Officials burdened with this task are guided and constrained by Congressional mandate—a mandate that has matured in the last century from a policy of near *laissez faire,* in the years prior to the Great Depression, to the current national posture of watchful conservation and affirmative action to improve rangeland conditions.

The history of grazing policy and politics in the west and in Washington, D.C., has

been the story of competing interests, changing values, and, unfortunately, deteriorating resources. In order that the issues in this lawsuit may be more fully comprehended, a brief look at the development of this policy is essential.

### A. The Public Domain

From the mid-nineteenth century until 1934, when Congress first enacted comprehensive legislation regulating rangeland management, the key battles over the public lands were between ranchers, who sought to monopolize the range for their own uses, and "homesteaders, nomadic herders," and a few government officials, who struggled to "keep the public lands open and available to all comers."[5] The frontier attitudes of western ranchers made the western cattle industry firmly opposed to legal regulation. Nevertheless, many ranchers during this period employed sophisticated legal strategies for maintaining their monopoly over the use of public lands.[6]

Federal law, while sparse, became a force against the monopolistic tendencies of the ranchers. The Unlawful Enclosures Act of 1885 prohibited the fencing of any public lands or the prevention of free entry upon or passage through public lands. Unlawful Inclosures of Public Land Act, 43 U.S.C. §§ 1061–66. In 1890, the Supreme Court held that "there is an implied license, growing out of the custom of nearly a hundred years" that the public lands, particularly the grazing lands, "shall be free to the people who seek to use them." *Buford v. Houtz,* 133 U.S. 320, 326, 10 S.Ct. 305, 307, 33 L.Ed. 618 (1890).

The public domain described by the Supreme Court in *Buford* was rapidly shrinking by the early twentieth century as a result of the Nation's generous homesteading laws and massive federal withdrawals of public lands. *Coggins II,* at 35. Lands

---

5. *See generally,* Coggins & Lindeberg-Johnson, *Public Rangeland Management II: The Commons and the Taylor Act,* 13 Envtl.L. 1, 23 (1982) (hereinafter cited as *Coggins II* ).

6. *See* Scott, *The Range Cattle Industry: Its Effect on Western Land Law,* 28 Mont.L.Rev. 155, 156 (1967).

were withdrawn for such public purposes as Indian reservations, military uses, and for inclusion in the National Park and Forest Systems. *Id.* In 1934, Congress completed the shrinking process by enacting a system of range allocation which is still the foundation for federal public rangeland management.

### B. The Taylor Grazing Act of 1934

The Taylor Grazing Act, 43 U.S.C. § 315, *et seq.*, authorized the Secretary to withdraw those lands which remained unappropriated for specific public uses, and divide them into grazing districts. *Id.* § 315. The main goals of the Act as set forth in its preamble were to improve the rangeland conditions and to stabilize the western livestock industry.[7] The Secretary was empowered to make rules, regulations and contracts with permittees [8] and was subject to little constraint in how he chose to carry out the legislative purposes of the Taylor Act.

The Secretary was also authorized to issue permits to graze livestock to stock owners "upon the payment of a reasonable fee." 43 U.S.C. § 315b. Ranchers and other settlers with existing livestock operations were given preference in the issuance of grazing permits and the duration of permits was limited to a maximum of ten years. *Id.* Congress also admonished that

the issuance of a grazing permit created no "right, title, interest, or estate in or to the lands" but built into the permit system a "preference right of the permittees to renewal in the discretion of the Secretary." *Id.*

While the Secretary was given wide discretion and existing users were given generous preferences, Congress nevertheless, for the first time in the Taylor Act, directed the *Secretary,* and not the ranchers, to rule the range. In no uncertain terms Congress provided that the *extent* of livestock grazing (i.e., numbers of animals per acre) and the *timing* of livestock grazing (i.e., seasons of use) were to be *specified* by the Secretary.[9] Thus, in deference to the recognized injury to the rangelands caused by the largely unregulated exploitation of public lands, and in the apparent hope that regulation would help stabilize the western livestock industry, Congress in the Taylor Act, essentially closed the public domain.

The process of carving up the land into grazing districts was swift, "hasty," and dominated by the stock industry itself.[10] By the 1970's it was the view of many experts that the BLM had failed to achieve one of the principal goals of the Taylor Act, namely to improve range conditions or at a minimum to "stop injury to the public graz-

---

7. "To stop injury to the public grazing lands by preventing overgrazing and soil deterioration, to provide for their orderly use, improvement, and development, to stabilize the livestock industry dependent upon the public range, and for other purposes." Act of June 28, 1934, preamble, Pub.L. No. 482, ch. 865, 48 Stat. 1269. *See Coggins II, supra,* note 5, at 48 n. 303. "To call the Taylor Grazing Act purely environmental is to ignore its language and its history." *Natural Resources Defense Council, Inc. v. Morton,* 388 F.Supp. 829, 833 (D.D.C.1974).

8. 43 U.S.C. § 315a.

9. "Such permits shall be for a period of not more than ten years, subject to the preference right of the permittees to renewal in the discretion of the Secretary of the Interior, *who shall specify from time to time numbers of stock and seasons of use.*" 43 U.S.C. § 315b (emphasis added).

10. *Coggins II, supra,* at 56, *citing, inter alia, Bureau of Land Management, Public Land Statistics* 21, at 87 n. 6 (1975). In 1939, the Taylor Act was amended to provide a kind of participatory democracy for ranchers and to avoid bureaucratic arbitrariness. Advisory boards in each district, composed mainly of livestock ranchers, would thereafter be consulted for advice and recommendations on each application for a grazing permit within its district, except that no rancher could participate as an advisor with respect to his own permit. 43 U.S.C. § 315 *o*–1. The Bureau of Land Management did not enter the picture until 1946. The original Act was administered by an entity called the Grazing Division which became the Grazing Service in 1939. "On July 16, 1946, the Grazing Service was reorganized into the Bureau of Land Management and ceased to exist as a separate organization." *Historical Summary of Grazing Fee Events,* reprinted in 1978 U.S.Code Cong. & Ad.News 4107.

ing lands by preventing overgrazing and soil deterioration." [11]

In 1975, the BLM reported to the Senate Committee on Appropriations that only about 19% of the acres under its control were "improving," while 65% were "static," and 16% were admittedly "declining." [12] These estimates, as depressing as they were, apparently *understated* the static and declining condition of the already ravaged public lands according to subsequent reports issued by the BLM and the United States Accounting Office. [13]

Critics of the BLM's management brought suit in the early seventies to compel the preparation of an individual environmental impact statement for each grazing district. In 1974, the United States District Court for the District of Columbia jolted the agency by granting the relief sought by plaintiffs and observing that "the BLM has shown relatively slow progress in implementing a thorough management planning system which would assist in protecting the environment." *Natural Resources Defense Council, Inc. v. Morton, supra*, 388 F.Supp. at 836. As a result of the BLM's "slow progress," the Court observed that "in a substantial and practical sense there is a serious threat of injury to the public lands which lends ur-

gency to plaintiffs' claims." *Id.* The jolt felt by the BLM from the courts and other critics must have also reached Congress which, in 1976, enacted a new livestock management system premised on the specific finding that "a substantial amount of the Federal range lands is deteriorating in quality." 43 U.S.C. § 1751(b)(1).

## C. Federal Land Policy & Management Act

The Federal Land Policy & Management Act of 1976, 43 U.S.C. § 1701, *et seq.* (hereinafter FLPMA), was a comprehensive statement of the public policy of the United States, declaring that public lands be systematically inventoried and subjected to a land use planning process which would enable them to be managed by the Secretary of the Interior

in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy use.

---

11. *See, supra,* note 7. In 1977, the Comptroller General of the United States reported to Congress on the condition of the public rangelands and concluded bluntly:

> The Nation's public rangelands have been deteriorating for years and, for the most part, are not improving. These vast lands need to be protected through better management by the Bureau of Land Management.
> Deterioration can be attributed principally to poorly managed grazing by livestock—horses, cattle, sheep, and goats. Livestock have been permitted to graze on public rangelands year after year without adequate regard to the detrimental effect on range vegetation.

Document No. 206. U.S. General Accounting Office, *Public Rangelands Continue To Deteriorate*, CED-77-88 (Washington D.C.: U.S. Government Printing Office, 1977), p. i. A stinging and comprehensive report by the Council on Environmental Quality in 1981 discussed the deterioration of the public lands in terms of "desertification" and pointed out that a good portion of the lands in the United States with the most severe problems were under the

management of the Bureau of Land Management. Plaintiffs' Ex. 1, CEQ (Sheridan), *Desertification of the United States*, (Washington D.C.: U.S. Government Printing Office 1981), p. 11. The CEQ Report described "desertification" which is the result of overgrazing as "an affliction that saps an arid land's ability to support life" and listed its five major symptoms as: (1) declining groundwater tables; (2) salinization of topsoil and water; (3) reduction of surface waters; (4) unnaturally high soil erosion; and (5) desolation of native vegetation. *Id.* at 1.

12. Document No. 207. U.S. Bureau of Land Management, *Range Condition Report*, prepared for the Senate Committee on Appropriations (Washington D.C.: U.S. Government Printing Office, 1975), pp. II–12—II–13.

13. U.S. Bureau of Land Management, "Managing the Public Rangelands" (public review draft, October 1979), p. 26; U.S. General Accounting Office, *Public Rangelands Continue to Deteriorate, supra,* note 11, pp. iii–iv.

43 U.S.C. § 1701(a)(8). FLPMA did *not* repeal the essential provisions of the Taylor Act, but rather *added* a new management structure within which the Secretary was to operate.[14]

The Act contains an implicit denunciation of past practices of the BLM in managing public grazing lands:

> Congress finds that a substantial amount of the Federal range lands is deteriorating in quality, and that installation of additional range improvements could arrest much of the continuing deterioration and could lead to substantial betterment of forage conditions with resulting benefits to wildlife, watershed protection, and livestock production.

**14.** FLPMA expressly renewed the Secretary's regulatory and rulemaking authority by empowering him to "establish comprehensive rules and regulations after considering the views of the general public ..." 43 U.S.C. § 1701(a)(5).

**15.** "Sustained yield" is defined in FLPMA as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources consistent with multiple use." 43 U.S.C. § 1702(h). "Multiple use" is defined in FLPMA as meaning "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over area large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1701(c). The requirement of management for multiple use and sustained yield is modeled after the U.S. Forest Service's Multiple-Use, Sustained Yield Act of 1960 (the MUSY Act), 16 U.S.C. §§ 528–531.

**16.** In order to avoid confusion, the Court throughout this opinion refers to FLPMA of

43 U.S.C. § 1751(b). FLPMA's principal management requirement is that the Secretary "*shall*" manage the public rangelands for "multiple use and sustained yield." 43 U.S.C. § 1732(a).[15] Moreover, the Act directs that land use plans be developed and that the public lands shall be managed "in accordance with the land use plans" when they are available. *Id.*

*1. Permit Issuance Requirements.* The provisions of FLPMA which raise the principal disputes in this lawsuit, however, are the very specific requirements for permits and leases contained in 43 U.S.C. § 1752.[16] Since, as will be explained, these issues turn on the express language of Congress, a complete treatment of the permit and lease provisions is essential.[17]

1976 when it discusses provisions contained in 43 U.S.C. § 1701, *et seq.* The reader should note, however, that certain provisions of FLPMA were *amended* by the Public Rangelands Improvement Act of 1978, particularly by Sections 7 and 8 of that Act. Several of those 1978 amendments are reflected in the current version of 43 U.S.C. § 1701, *et seq.*, and particularly in § 1752 discussed at length herein. The Court's reference is always to the *amended* version.

**17.** 43 U.S.C. § 1752 provides in pertinent part:

> (a) Terms and conditions
> Except as provided in subsection (b) of this section, permits and leases for domestic livestock grazing on public lands issued by the Secretary ... shall be for a term of ten years *subject to such terms and conditions the Secretary concerned deems appropriate and consistent with the governing law, including, but not limited to, the authority of the Secretary concerned to cancel, suspend, or modify a grazing permit or lease, in whole or in part, pursuant to the terms and conditions thereof, or to cancel or suspend a grazing permit or lease for any violation of a grazing regulation or of any term or condition of such grazing permit or lease.*

> .    .    .    .    .

> (d) Allotment management plan requirements
> *All permits and leases* for domestic livestock grazing issued pursuant to this section *may incorporate an allotment management plan* developed by the Secretary concerned. However, nothing in this subsection shall be construed to supersede any requirement for completion of court ordered environmental impact statements prior to development and incorporation of allotment management plans. If the Secretary concerned elects to develop

Under FLPMA the typical permit or lease (hereinafter the Court's reference to "permits" shall include within the meaning of that term "permits and leases") is intended to be for a duration of ten years except under specified conditions not relevant herein. Each permit may include such "terms and conditions" deemed appropriate by the Secretary so long as those terms and conditions are "consistent with the governing law." 43 U.S.C. § 1752(a). The terms and conditions in permits shall, however, include, but not be limited to, "the authority" of the Secretary "to cancel, suspend or modify" the permit "in whole or in part" pursuant to the terms and conditions in the permit, or to "cancel or suspend" the permit for violations by the permittee of grazing regulations or permit requirements. *Id.* Assuming that during the term of the permit the land has been used for livestock grazing, and that the permittee has complied with all permit requirements, and has accepted any new conditions of the Secretary, the holder of an expiring permit "shall be given first priority" for permit renewal at the end of ten years. 43 U.S.C. § 1752(c).

Under FLPMA, however, the Secretary is not given carte blanche authority to issue ten-year permits containing whatever terms and conditions are deemed appropriate. The statute is remarkably clear and specific in its requirement that *all* permits conform to one of two prescribed methods of issuance. 43 U.S.C. § 1752(d), (e). Furthermore, as noted, Congress directed that among the terms and conditions to be included in each permit shall be an express retention of authority by the Secretary to cancel, suspend, or modify the permit under specified circumstances. 43 U.S.C. § 1752(a).

*2. Allotment Management Plans.* The first of FLPMA's only two permissible methods of permit issuance is outlined in § 1752(d) and entails the incorporation into some permits of so-called Allotment Management Plans (hereinafter "AMPs"). AMPs have been described by Professor Coggins as "the penultimate step in the multiple use planning process" and as "basically land use plans tailored to specific grazing permits."[18] Congress has defined an AMP as being a document which *"prescribes* the manner in, and extent to, which

an allotment management plan for a given area, he shall do so in careful and considered consultation, cooperation and coordination with the lessees, permittees, and landowners involved, the district grazing advisory boards established pursuant to section 1753 of this title, and any State or States having lands within the area to be covered by such allotment management plan.

*Allotment management plans shall be tailored to the specific range condition of the area to be covered by such plan, and shall be reviewed on a periodic basis to determine whether they have been effective in improving the range condition of the lands involved or whether such lands can be better managed under the provisions of subsection (e)* of· this section. *The Secretary concerned may revise or terminate such plans or develop new plans from time to time* after such review and careful and considered consultation, cooperation and coordination with the parties involved. As used in this subsection, the terms "court ordered environmental impact statement" and "range condition" shall be defined as in the "Public Rangelands Improvement Act of 1978 [43 U.S.C.A. § 1901, et seq.]."

(e) Omission of allotment management plan requirements and incorporation of appropri-

ate terms and conditions; reexamination of range conditions

*In all cases where the Secretary concerned has not completed an allotment management plan or determines that an allotment management plan is not necessary* for management of livestock operations and will not be prepared, *the Secretary concerned shall incorporate in grazing permits and leases such terms and conditions as he deems appropriate* for management of the permitted or leased lands pursuant to applicable law. The Secretary concerned *shall also specify therein the numbers of animals to be grazed and the seasons of use and that he may reexamine the condition of the range at any time and,* if he finds on re-examination that the condition of the range requires adjustment in the amount or other aspect of grazing use, *that the permittee or lessee shall adjust his use to the extent the Secretary concerned deems necessary.* Such readjustment shall be put into full force and effect on the date specified by the Secretary concerned.

43 U.S.C. § 1752 (emphasis supplied).

**18.** Coggins, *The Law of Public Rangeland Management IV: FLPMA, PRIA, and the Multiple Use Mandate,* 14 Envtl.L. 1, 24 (1983) (hereinafter cited as *Coggins IV).*

livestock operations will be conducted...." 43 U.S.C. § 1702(k)(1).[19] On the other hand, AMPs need only *describe* "the type, location, ownership, and general specifications for ... range improvements" on grazing allotments, 43 U.S.C. § 1702(k)(2), and may include other appropriate terms and conditions the Secretary wishes to insert. 43 U.S.C. § 1702(k)(3). If the Secretary chooses to incorporate an AMP into a permit, § 1752(d) requires that the AMP be "tailored to the specific range condition of the area" and mandates that the Secretary review each AMP on a periodic basis to determine whether the AMP has been effective in improving range conditions in the area.

The Secretary is empowered to revise or terminate AMPs but only following "consultation, cooperation, and coordination" with the parties involved. 43 U.S.C. § 1752(d). In fact, the dominant import of subsection (d) is that the final *prescription* of grazing practices contained in any AMP must be the result of "careful and considered consultation, cooperation, and coordination with the lessees, permittees, and landowners involved." *Id.* The decision whether to incorporate an AMP into a permit is wholly within the discretionary judgment of the Secretary.

*3. Permits Without AMPs.* The statute, however, provides only a single alternative in the event the Secretary has *not* completed an AMP. In such cases, the Secretary need not proceed by way of consultation with permittees, but may simply issue permits which themselves prescribe appropriate livestock management practic-

es. 43 U.S.C. § 1752(e). This short-cut method of prescribing grazing practices requires the Secretary to "incorporate in grazing permits and leases such terms and conditions as [the Secretary] deems appropriate" but also requires that the Secretary "shall specify" in each permit: (1) "the number of animals to be grazed" by the permittee; (2) "the seasons of use" for livestock grazing; and (3) a provision that the Secretary "may reexamine the condition of the range *at any time*" and, if necessary, "readjust" the livestock grazing prescription for the allotment. *Id.* (emphasis supplied).

From the plain language of the statute there is no question in this Court's view that the AMP and no-AMP methods of permit issuance, provided for in § 1752(d) and (e) are the *only* permissible methods: § 1752(e) provides that the required permit conditions respecting "numbers of animals," "seasons of use," and "reexamination" and "readjustment," shall be incorporated into permits "in all cases" where an AMP is not so incorporated.

But even where an AMP *is* incorporated, the Secretary nevertheless must *prescribe* the manner in and extent to which livestock practices are conducted on grazing allotments. 43 U.S.C. § 1702(k)(1). Moreover, *all* permits, including those containing AMPs, must contain provisions by which the Secretary expressly retains authority to cancel, suspend, or modify permit terms and conditions. 43 U.S.C. § 1752(a), (d), and (e).[20]

Thus, as a practical matter, the only significant difference between the two permis-

**19.** In language of particular importance to this lawsuit, allotment management plans are defined in FLPMA as follows:

(k) An *"allotment management plan"* means a document prepared in consultation with the lessees or permittees involved, which applies to livestock operations on the public lands or on lands within National Forests in the eleven contiguous Western States and which:

(1) *prescribes the manner in, and extent to, which livestock operations will be conducted* in order to meet the multiple-use, sustained-yield, economic and other needs and objectives as determined for the lands by the Secretary concerned; and

(2) describes the type, location, ownership, and general specifications for the range improvements to be installed and maintained on the lands to meet the livestock grazing and other objectives of land management; and

(3) contains such other provisions relating to livestock grazing and other objectives found by the Secretary concerned to be consistent with the provisions of this Act and other applicable law.
43 U.S.C. § 1702(k) (emphasis supplied).

**20.** To the extent that 43 U.S.C. § 1752(a) leaves any doubt that each grazing permit must contain an express revocation or suspension clause, § 1732(c), applicable to *all* instruments autho-

sible methods for issuing livestock grazing permits under FLPMA are two: (1) permits containing AMPs must involve careful and considered consultation, cooperation, and coordination with permittees; and (2) the prescription of livestock practices in a permit containing an AMP must be tailored to the specific conditions of the range on the allotment, whereas the permit without an AMP may apparently reflect general or universal livestock management standards.

In sum, Congress by enactment of FLPMA, did not weaken but rather strengthened the mandate it handed the Secretary in 1934 to rule the range. By FLPMA's provisions requiring the Secretary to issue permits prescribing grazing practices and expressly retaining authority to cancel, suspend or modify, Congress gave specific meaning to its general instructions to the Secretary, to wit: "The Secretary *shall* manage the public lands ..." 43 U.S.C. § 1732(a) (emphasis supplied).

### D. The Public Rangeland Improvement Act

The Public Rangelands Improvement Act of 1978, 43 U.S.C. § 1901, *et seq.* (hereinafter PRIA), clarified and refined the essential Congressional message to the Secretary, namely, that the public lands be managed with more attention paid to range *improvement.* Congress made several findings which shed light on the purposes of the various statutes pertaining to public management of grazing lands. "[V]ast segments of the public rangelands" were found to be "producing less than their potential" for the multiple uses for which those lands were being managed. 43 U.S.C. § 1901(a)(1). For this reason, Con-

gress found that these vast areas were in "an unsatisfactory condition." *Id.* Congress recognized the need for additional funding to resurrect the damaged lands, 43 U.S.C. § 1901(a)(2), and noted that these unsatisfactory conditions:

> present a high risk of soil loss, desertification, and a resultant underproductivity for large acreages of the public lands; contribute significantly to unacceptable levels of siltation and salinity in major western watersheds including the Colorado River; negatively impact the quality and availability of scarce western water supplies; threaten important and frequently critical fish and wildlife habitat; prevent expansion of the forage resource and resulting benefits to livestock and wildlife production; increase surface runoff and flood danger; reduce the value of such lands for recreational and esthetic purposes; and may ultimately lead to unpredictable and undesirable long-term local and regional climatic and economic changes.

43 U.S.C. § 1901(a)(3). Congress found that such devastating potential impact might be avoided through "intensive" maintenance, management, and improvement programs, 43 U.S.C. § 1901(a)(4), and established and reaffirmed the national policy and commitment to inventorying public lands, and to managing the public lands "so that they become as productive as feasible for all rangeland values." 43 U.S.C. § 1901(b)(1), (2). PRIA expressly reenacted the Taylor Act and FLPMA.[21]

### III. COOPERATIVE MANAGEMENT AGREEMENTS

#### A. The Regulation and Program

1. *Promulgation.* The regulation establishing the Cooperative Management

---

rizing use of public lands, requires the same conditions in more specific language.

**21.** "The Secretary shall manage the public rangelands in accordance with the Taylor Grazing Act (43 U.S.C. 315–315(*o*)), [and] the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701–1782) ..." 43 U.S.C. § 1903(b). A principal issue in this lawsuit concerns the PRIA provisions contained in § 1908, authorizing the Secretary to implement an "Experimental Stewardship Program" in order to provide

"incentives to, or rewards for" grazing permittees whose practices have resulted in "improvement of the range condition." 43 U.S.C. § 1908. As will be discussed in a later section of this opinion, the Secretary has argued in this case that the experimental program provides all necessary authorization for the programs challenged by plaintiffs herein. Detailed description of § 1908 and its degree of applicability to this case is reserved for later treatment.

Agreement (CMA) program[22] authorizes the BLM to enter into special permit arrangements with selected ranchers who have demonstrated "exemplary rangeland management practices." 43 C.F.R. § 4120.1(a). "Exemplary practices" are not defined in the regulation, rather, the choice of ranchers is apparently within the discretion of BLM officials.

The expressed purpose of the CMA program is to allow these ranchers the heretofore *verboten* opportunity to "manage livestock grazing on the allotment as they determine appropriate." 48 Fed.Reg. at 21823–24 (proposed 43 C.F.R. § 4120.1). The BLM is bound by the terms of a CMA for ten years. 43 C.F.R. § 4120.1(b). All

CMAs must be "consistent with, and incorporate by reference" existing land use plans and the "terms of the authorization[s]" issued to the cooperative permittee. 43 C.F.R. § 4120.1(a).[23] The rule envisions periodic evaluations and provides for cancellation or modification only in the event of unauthorized transfers, violation of whatever terms and conditions the Secretary inserts in the CMA, or violation of regulations unrelated to overgrazing. *See* 43 C.F.R. §§ 4120.1(b), (c), and (d); 4170.1–4.

*2. Implementation.* The scope of the CMA regulation is illuminated by the manner in which the BLM has implemented the program.[24] On June 20, 1984, the Bureau

---

**22.** The rule, 43 C.F.R. § 4120.1 (1984), provides:

(a) The authorized officer of the Bureau of Land Management may enter into a cooperative management agreement with any permittee or lessee who has demonstrated exemplary rangeland management practices.

(1) A cooperative management agreement establishes the responsibilities and performance standards of the cooperating parties in managing and using of the public lands to graze livestock.

(2) A cooperative management agreement shall be consistent with, and incorporate by reference, all applicable provisions of any existing land use plan as well as the terms of the authorization(s) issued to the cooperative party to graze livestock on the allotment(s).

(3) A cooperative management agreement shall not empower the cooperating party to exclude or limit other authorized uses on the allotment(s).

(b) A cooperative management agreement shall be issued for a term of 10 years and, at the discretion of the authorized officer of the Bureau of Land Management, may be renewed.

(c) A cooperative management agreement, and a cooperating party's performance under it, shall be periodically evaluated by the Bureau of Land Management.

(d) A cooperative management agreement may be transferred by operation of law. If the cooperating party is organized as a corporation or partnership, the cooperative management agreement may, upon notice to the authorized officer, also be transferred as an incident to any change of less than 100 percent in the business organization. All other transfers of the cooperative management agreement are prohibited and shall result in its automatic termination.

43 C.F.R. § 4170.1–4 provides further:

Violation of the terms and conditions of a cooperative management agreement may result in the cancellation of the agreement. Where violation of Subpart 4140 Prohibited Acts occurs, the authorized officer may take appropriate action under § 4170.1–1 of this title.

45 Fed.Reg. 6451 & 6455 (February 21, 1984).

**23.** What defendants intended by the term "authorizations" is facially mysterious. However, after reviewing several of the CMAs already prepared by the BLM, the Court is of the view that the rule merely requires the BLM to incorporate by reference the terms of permits or leases drafted simultaneously with CMAs. Defendants have suggested that the Court could interpret this provision to mean that *existing* allotment management plans and permits *must* be incorporated into each CMA. If this were true, however, the very purpose of the CMA program would be defeated, since under existing authorizations ranchers could not manage livestock as *they* determined appropriate. Existing AMPs and permits *prescribe* the manner in and extent to which livestock grazing shall be conducted. Moreover, defendants have *not* uniformly incorporated existing AMPs and permits into the CMAs already prepared.

**24.** At oral argument, defense counsel maintained that the BLM's implementation of the CMA program constituted a "valid interpretation of the regulations." Counsel was responding at the time to a question put to him by the Court regarding whether the program as *implemented* was consistent with the regulation as *promulgated.* Since the government is apparently of the view that the BLM's interpretation and implementation of the Secretary's rule is valid and consistent with the intent of the rule, the CMAs already prepared and the BLM's implementation procedures are of unquestionable relevance.

issued the "BLM Manual Handbook H–4120–1", Document No. 182 (hereinafter "Handbook") which included procedural direction and standards for CMAs. Also, twenty-seven individual CMAs were entered into by the BLM prior to the filing of this lawsuit.

The Handbook defines a CMA as a "formal, written agreement between the BLM and a permittee ... that recognizes the cooperator as the steward of the allotment" and which must "be consistent with, and incorporate by reference" relevant provisions of existing land use plans. "Handbook," § .1(.11), pp. 1–2. The Handbook makes plain that CMAs are neither AMPs *nor* permits containing prescriptions for numbers of animals or seasons of use. In fact, defendants instruct BLM officers in the Handbook, that in the event an AMP is in existence when the CMA is executed:

> [t]he CMA *may* incorporate the objectives of the AMP, but *must* provide the permittee ... with *special recognition* and an opportunity to exercise *additional* management flexibility.

"Handbook," § .1(.11)(E), p. 2 (emphasis supplied). Thus, the CMA *supersedes* existing authorizations.

The Handbook also clarifies how defendants have managed to reward favored permittees with "secure tenure."[25] The instructions indicate that CMA permittees shall not be subject to evaluation before "the end of the first 5 years" at which time a "joint evaluation" will take place.

§ .1(.11)(F), p. 2. The permittee is automatically entitled to a CMA renewal (transforming it into a fifteen-year contract) if the mutual examination reveals that the agreement's objectives are being met. If the objectives have *not* been realized after five years, the permittee is nevertheless entitled to an additional five years within which to comply. The BLM, therefore, forfeits any remedy for the rancher's failure to meet objectives except that of denying renewal of the CMA after ten years of non-compliance. This is secure tenure indeed.[26]

A review of the CMAs which have been drafted and executed by defendants, confirms that the Secretary's expressed purposes for the CMA program (secure rancher tenure and self-management) have been implemented.[27] Example agreements cited by *both* plaintiffs' and defendants' counsel indicate that CMAs need not contain specific performance standards such as numbers of animals or seasons of use. *See Spring Cove CMA*, (August, 1984, Shoshone, Idaho District, BLM); *McMullin Bros. CMA*, (August, 1983, Miles City, Montana District, BLM). These agreements list no terms or conditions whatsoever which prescribe the manner in or extent to which livestock grazing shall be managed on these allotments. The permits which accompany these agreements are brief documents containing no grazing specifications. The agreements do contain, however, the

---

**25.** Tenure is explained as follows:

*Tenure.* CMAs have a tenure period of ten years, and at the discretion of the authorized officer, may be renewed. (See 43 C.F.R. 4120.1(b)). CMAs must receive *joint evaluation at the end of 5 years* to determine if the management objectives are being met. Results of that evaluation should be made available to interested parties requesting the results. *If that evaluation shows that the objectives are being successfully met, a new CMA and 10–year permit or lease is issued. If the objectives are not being met, the cooperator is allowed a reasonable time to make the necessary adjustments to comply with the objectives before the agreement terminates.* Failure of the cooperator to meet the terms and conditions of the CMA may be a basis for cancellation of the CMA.

"Handbook," § .1(.11)(F), p. 2 (emphasis supplied).

**26.** While defendants have ostensibly reserved authority to cancel, suspend, or modify CMAs for violations of the terms and conditions of the CMA, the only performance standards included in the CMA agreements are termed "objectives" rather than terms or conditions. Terms and conditions are purposefully vague. Thus, it is apparently impossible for a permittee to risk mid-term interruption of a CMA by mere overgrazing.

**27.** The government has maintained that *each* of the twenty-seven CMAs in the record is fully consistent with the Secretary's intent.

BLM's promise of non-interference and secure tenure as outlined in the Handbook.

In short, the CMA program was intended to and did create and authorize a *new* regulatory form not contained in the Taylor Grazing Act, FLPMA, or PRIA.

### B. The Administrative Procedures Act

Plaintiffs have contended that the CMA program was adopted in violation of basic public participation requirements of the Administrative Procedures Act (APA), 5 U.S.C. § 553.[28] Although plaintiffs made reference in their briefs to four procedural arguments, the Court will herein address only two:[29] (1) that defendants' notice of proposed rulemaking was insufficient to alert the public to the issues relevant to the CMA program; and (2) that the statement accompanying the final rulemaking did not adequately explain the basis and purpose of the program nor respond adequately to public comments.

**28.** Section 553, in pertinent part, provides as follows:

> (b) General notice of proposed rulemaking shall be published in the Federal Register .... The notice shall include—
> (1) a statement of the time, place, and nature of public rulemaking proceedings;
> (2) reference to the legal authority under which the rule is proposed; and
> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
>
> .     .     .     .     .
> (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose....

**29.** It shall be unnecessary to decide whether (1) defendants unlawfully implemented the CMA program *before* publishing the proposed or final rule in the *Federal Register;* or (2) whether "the Handbook," outlining the program's specific operation, should have been published in the *Federal Register* or otherwise subjected to notice and comment procedures. As to the first question, it is undisputed that at least six individual

*1. Notice of Proposed Rulemaking.* Under 5 U.S.C. § 553(b) and (c), defendants were required to publish a notice of the proposed rule and "give interested persons an opportunity to participate in the rulemaking." The agency's publication in the *Federal Register* should have included "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). Furthermore, "[s]ince the public is generally entitled to submit their views and relevant data on any proposals, the notice 'must be sufficient to fairly apprise interested parties of the issues involved....' " *Action for Children's Television v. F.C.C.*, 564 F.2d 458, 470 (D.C.Cir.1977), *citing,* S.Doc. No. 248, 79th Cong., 2d Sess. 258 (1946).

Plaintiffs contend that the notice of the proposed CMA regulation failed to reveal the agency's reasoning sufficiently to permit a meaningful exchange of views with the public. In the notice, 48 Fed.Reg.

CMAs were executed before defendants finalized the regulation. While federal agencies must generally issue a notice of proposed rulemaking with opportunity for public comment *prior* to implementing a regulatory program, 5 U.S.C. § 553(b)–(c), the question of premature implementation is of no particular relevance to the final rulemaking itself or to the CMAs executed *after* its promulgation. The only issue squarely raised is whether the Court should *separately* dismantle the six premature agreements. Given the Court's disposition by this Order of the issues concerning the *entire* program, including the six premature agreements, a separate invalidation would be redundant. For a similar reason there is no need to address plaintiffs' argument that defendants violated the APA as well as the Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(1), by issuing "the Handbook" without first subjecting it to procedural hurdles. Even should the Court accept plaintiffs' position with respect to "the Handbook," it is unclear whether any of the twenty-seven existing CMAs would be invalidated by the ruling. Certainly the CMA regulation itself would in no way be affected. Thus, plaintiffs' substantive challenges to the *entire* program would still need to be addressed and a separate invalidation of "the Handbook" would merely duplicate the Court's disposition of the larger substantive issues. By contrast, plaintiffs' procedural arguments which the Court addresses in this section, if accepted, would require invalidation of the entire CMA program.

21820 (May 13, 1983), defendants explained that the aim of the proposed program was to encourage investments in rangeland productivity. *Id.* The proposed rule published that day, similar to the final rule, revealed that the new CMAs would "specify that the permittee, lessee, or association may manage livestock grazing on the allotment as they [sic] determine appropriate." *Id.*, at 21823.

■■ The Ninth Circuit has held that § 553(b)(3) means merely what it says, namely, that "a notice of rulemaking is sufficient if it provides a description of the subjects and issues involved." *California Citizens Band Assn. v. United States,* 375 F.2d 43, 49 (9th Cir.1967), *cert. denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). The notice in this case was sufficient to meet this standard. A robust debate, albeit an unfruitful one for plaintiffs, occurred as a result of the proposed rulemaking. The essential elements of the new program were adequately outlined to fairly apprise the public of what BLM was about to do.[30]

*2. Statement of Basis and Purpose.* The Court now turns to plaintiffs' stronger procedural argument. Under the APA, defendants were required to consider the issues raised in the public comments and to incorporate into the final rulemaking "a concise general statement of [the rule's] basis and purpose." 5 U.S.C. § 553(c). Defendants' duty was to "respond in a reasoned manner to the comments received, to explain how the agency resolved

any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule." *Rodway v. United States Department of Agriculture,* 514 F.2d 809, 817 (D.C.Cir.1975).

Defendants, on February 21, 1984, published the final rule and a response to the comments received. Defendants acknowledged that many of the comments "expressed the view that as written [the CMA rule] provided insufficient authority and control" to the BLM, 49 Fed.Reg. 6444, and that some comments had criticized existing CMAs as having withstood "insufficient public review." *Id.* Defendants further conceded that some of the comments challenged the Secretary's statutory authority for promulgation of the CMA regulation. *Id.* Plaintiffs argue that although defendants acknowledged the negative comments, there was a total failure to *respond* to them and a failure to justify the final rule in light of the comments received. The record indicates, however, that defendants declined to rebut many of the public comments because, as stated in its response, the agency was *convinced* by the comments that "the proposed regulations should be modified to more clearly indicate the objectives and approach of the cooperative management agreement within the general framework of multiple use management." *Id.* In fact, defendants *modified* the proposed rule in an effort to accommodate many of the commentators' most urgent warnings.[31]

**30.** Plaintiffs' main problem with defendants' notice is that defendants nowhere revealed that the program was premised upon the agency's authority pursuant to 43 U.S.C. § 1908, the so-called Experimental Stewardship program. Without a reference to this purported authority, argue plaintiffs, a member of the public could not be expected to comment on the agency's reliance on the Stewardship program. While plaintiffs' reasoning is persuasive, the Court today holds that defendants did not *in fact* rely on the Stewardship program for authority for the CMA rule. The Stewardship program has only become an issue in this case as a result of defense counsel's *post hoc* rationalization. In light of the Court's disposition of the issue, *infra,* section III(c), it is unnecessary to determine whether defendants'. failure to cite the

Stewardship program *would* have been fatal if it *had* been silently relied upon.

**31.** On the other hand, plaintiffs are perfectly correct that several comments were neither acted upon nor specifically refuted. Notably, the Department of Interior's own Associate Solicitor for Energy and Resources, Paul B. Smyth, was among those commentators who strenuously criticized the proposed CMA regulation. Smyth warned defendants that the rule "would be hard to defend" in court because it arguably had the effect of "delegating nondelegable duties to private parties." *See* Record, document No. 217, December 7, 1983. Although the final rule responded to some of Smyth's specific recommendations for bringing the program within legal

The Supreme Court has cautioned that an agency's failure to respond to specific comments is fatal to agency action only insofar as it demonstrates that a decision to act was not "based on a consideration of the relevant factors." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Although the agency's duty to respond to public comments is not to be taken lightly, neither should administrative proceedings be allowed to become "a game or a forum to engage in unjustified obstructionism" wherein agency determinations are routinely vacated on the ground that the agency failed to consider every matter "forcefully presented." *Vermont Yankee Nuclear Power Corp. v. N.R.D.C.,* 435 U.S. 519, 553–554, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978). District courts, therefore, generally exercise a measure of judicial restraint before striking agency decisions on the basis of relatively insubstantial procedural imperfections. In fact, no case brought to this Court's attention has interpreted the APA to "require the agency to respond to every comment, or to analyse every issue or alternative raised by the comments." *Thompson v. Clark,* 741 F.2d 401, 408 (D.C.Cir.1984).

█ Nevertheless, under the present facts, the question is a close one. On balance, however, defendants' statement of basis and purpose, when taken *in conjunction* with the notice of proposed rulemaking and particularly when considered in light of the revisions in the final rule made

by defendants in direct response to public comments, demonstrates that defendants considered the significant issues relevant to promulgation of the CMA rule. In so ruling, the Court also takes into account the fact that more than 150 comments were received on the dozens of regulations proposed in May of 1983. In responding to *all* of these comments, defendants filled over twenty-seven columns in the *Federal Register.* An agency must be granted allowance, under such circumstances, to decide for itself which comments warrant the greatest attention in the statement of basis and purpose. Consequently, on this record, the Court declines to find that defendants failed to consider and respond to the relevant comments submitted in opposition to the proposed CMA regulation.

Thus, the Court will address plaintiffs' substantive statutory arguments.

## C. *Experimental Stewardship*

Defense counsel's chief argument to uphold the CMA Program is premised on a clever interpretation of the Experimental Stewardship Program (ESP), contained in PRIA of 1978. 43 U.S.C. § 1908.[32] Congress by enacting ESP directed the Secretary to select areas of the rangelands of representative conditions, trends, and forages and in concentrating on these areas to "explore innovative grazing management policies and systems which might provide incentives to improve range conditions." *Id.* The incentive projects were to be ex-

---

requirements, most of his suggestions were simply ignored.

**32.** Section 1908 provides in relevant part, as follows:

(a) *Scope of program*
  The Secretar[y] of Interior ... [is] hereby authorized and directed to develop and implement, on an experimental basis on selected areas of the public rangelands which are representative of the broad spectrum of range conditions, trends, and forage values, a program which provides incentives to, or rewards for, the holders of grazing permits and leases whose stewardship results in an improvement of the range condition of lands under permit or lease. Such program shall

explore innovative grazing management policies and systems which might provide incentives to improve range conditions. These may include, but need not be limited to—
  (1) cooperative range management projects designed to foster a greater degree of cooperation and coordination between Federal and State agencies charged with the management of the rangelands and with local private range users,

  .    .    .    .    .

  (3) such other incentives as he may deem appropriate.
(b) *Report to Congress*
  No later than December 31, 1985, the Secretar[y] shall report to the Congress the results of such experimental program.

perimental and ready for Congressional review by December of 1985 when the Secretary was directed to report the "results" of the program. *Id.*

The government has maintained that even if the CMA program cannot be upheld under the Taylor Act and FLPMA, it is nevertheless fully justified by ESP. For the reasons stated herein, the Court finds this argument unsound.

■ This Court would ordinarily defer to the Secretary's judgment on matters such as the applicability of a particular program to a concededly generous delegation of experimental authority. However, it is blatantly obvious from the record that the Secretary did not in fact rely upon ESP when he promulgated the regulation authorizing the CMA program.[33] Not only is there no record of the Secretary ever relying on ESP for such authority, evidence in the record establishes that BLM has already completed its experimental stewardship projects. In fact, a brochure describing the completed ESP was produced by the ranchers participating in the three official "Experimental Stewardship Groups" organized by the BLM.[34] Given the manner in which BLM carefully identified the three regions subject to ESP experiments in the past, it would be strange indeed for it to establish a fourth experiment without so much as brief mention of section 1908 in any of the documents pertaining to the new program. The apparent truth is that the CMA program was never intended as a stewardship experiment. The Court must therefore view counsel's ESP argument as a *post hoc* rationalization for the CMA program and, as such, deserving of none of the customary deference accorded agency interpretations.[35]

■ However, assuming for the moment that the CMA program is not a lawful method of permit issuance under the Taylor Act and FLPMA, this Court is of the view that ESP would not create any additional authority for it even if the Secretary *had* relied upon section 1908. ESP did not create an exception to the permit issuance requirements of FLPMA. To the contrary, Congress ordered the Secretary to continue managing the lands "in accordance with" both the Taylor Act and FLPMA when it enacted PRIA in 1978. 43 U.S.C. § 1903(b).

Moreover, the legislative history, as cited to this Court by counsel on both sides, reveals that ESP vested no authority in the Secretary that was not *already available to him under the Taylor Act and FLPMA.* The legislative history also amply establishes that "experimentation" with FLPMA permit procedures was *not* what Congress had in mind when it enacted section 1908.[36]

**33.** Government counsel insists that ESP was "clearly" cited as authority for the CMA program in the Federal Register. *See* 48 Fed.Reg. 21822, (1983). This citation, however, merely sets forth the Secretary's general reliance on Taylor Act, FLPMA, and PRIA. Counsel has failed to refer this Court to any language in the Federal Register or elsewhere in the record which would rebut plaintiffs' argument that ESP was never asserted by the Secretary prior to this lawsuit and was never tested in the rulemaking process.

**34.** "The Experimental Stewardship Program: A Cooperative Approach to Rangeland Management," Document No. 674. Language in the brochure is enlightening on the question of whether the CMA program is actually an experimental stewardship program authorized by Congress. The program is described as if it were a completed experiment given a "finite lifespan by Congress." *Id.* at 17. Moreover, description of the three stewardship areas selected by the BLM

reveal that the projects were used as a means of developing allotment management plans within the permit issuance procedures of FLPMA.

**35.** "[I]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself," and not on the basis of "counsel's *post hoc* rationalizations." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983).

**36.** *See* 1978 U.S.Code Cong. & New, 4069, 4076–4077; H.Rep. Interior & Insular Affairs. Discussing the experimental stewardship provisions in PRIA, the Committee noted:

The Committee is aware that [the BLM has] sufficient existing authority to undertake the cooperative range management projects suggested by this legislation, and the committee feels that additional statutory directives are unnecessary. However, the Committee does

It is also manifest from the language of section 1908 that the CMA program simply does not meet the description of the projects ESP was intended to encourage. The CMA program is *not* an experiment, but is a permanent system of permit issuance aimed at a group of favored permittees. Significantly, there is no indication whatsoever that the "results" of the CMA program can be the subject of a report to Congress by December of 1985. None of the CMAs will even be ripe for review until several years after the Congressional reporting deadline.

Faced with such overwhelming evidence that ESP was never intended by Congress to open up exceptions to the permit issuance requirements in FLPMA, defense counsel argued at the hearing on this motion that the Secretary's ability to experiment under ESP "is bounded only by imagination." For this proposition, counsel relied exclusively upon scholarly comments of Professor Coggins, who described ESP in one of his articles in sweeping language:

> The Experimental Stewardship Program offers the BLM an opportunity to break out of an historical rut of range management counterproductivity. The agency is required to try new approaches, and the Act holds out carrots for cooperating ranchers. *The ability of the BLM to experiment is bounded only by imagination and available funding.*

recommend the use of the general purposes and procedures followed in [an existing BLM project], which we summarize here. *Id.* The Committee, then, at great length described a process whereby a broadly representative steering committee works closely with agencies and landowners in order to "integrate planning into and develop a cooperative range management plan, consisting of a number of smaller plans for the various allotments." Congress envisioned that experimental stewardship projects would be aimed at range improvement initiatives and other incentives for future range improvements, and that all such plans would be integrated into the existing permit issuance and allotment management plan structure contained in FLPMA.

**37.** A later article by Professor Coggins corrects any such misreading of his earlier statement

*Coggins IV, supra* note 18, at 128 (emphasis supplied). Putting aside for present the lack of precedential value in a law review article, Professor Coggins was surely *not* to be understood to be opining that the Secretary's ability to experiment was not also bounded by existing law.[37] At any rate, it is the ruling of this Court that any experimentation with new permit issuance procedures *is* bounded by existing law, as well as by the Secretary's imagination, and the ESP does not create an exception to the FLPMA permit requirements. Therefore, in order to uphold the CMA regulation, this Court must be satisfied that the Secretary is authorized under the Taylor Act and FLPMA to enter into cooperative management agreements with selected ranchers.

### D. Violations of Federal Grazing Statutes

■ Plaintiffs' principal contention is that the CMA regulation, as finally promulgated and implemented by the Secretary and the BLM, is a naked violation of defendants' affirmative duties under the Taylor Grazing Act, FLPMA, and PRIA. The Court agrees. The CMA program disregards defendants' duty to prescribe the manner in and extent to which livestock practices will be conducted on public lands. The program also overlooks defendants' duty of expressly reserving, in all permits, sufficient authority to revise or cancel livestock grazing authorizations when necessary.[38]

about ESP. Coggins lambasts the proposed regulations at issue in this lawsuit. He argues that the "overall impulse in the regulations" is to "return grazing management to near-total rancher control" and that, in his view, such experimentations "have little or no warrant in the statutes." Coggins, *The Law of Public Rangeland Management V: Prescriptions for Reform,* 14 Envtl.L. 497, 499 n. 8 (1984).

**38.** Less clear is whether the CMA program unlawfully omits to provide specific procedures for public participation. *See* 43 U.S.C. § 1739(e) which requires that the Secretary "shall establish procedures, including public hearings where appropriate" to give the public notice and an opportunity to comment on and participate in programs for public lands management. In light of the Court's ruling that the CMA program violates FLPMA's permit is-

*1. Duty to Prescribe Practices.* The CMA program authorizes a permanent system of preferential permit issuance. Since 1934, defendants have been authorized to issue such permits but have also been required "from time to time" to "specify" the "numbers of livestock" permittees may graze on the lands and the "seasons of use" for such livestock grazing purposes. 43 U.S.C. § 315b. By enacting FLPMA in 1976, Congress clarified this duty by obligating defendants to conform to one of two prescribed methods of permit issuance. 43 U.S.C. § 1752(d)–(e). Defendants may, after cooperation and consultation with ranchers, tailor a specific grazing prescription to each allotment by incorporating an AMP into each permit. *Id.*, at § 1752(d). Defendants may, instead, choose to forego incorporation of an AMP, and, in such case, specify in the *permit itself* the prescription of numbers of livestock and seasons of use. *Id.*, at § 1752(d). While these choices provide defendants with an extraordinary degree of flexibility and discretion, there is no question that defendants' choices under FLPMA are limited to these two. Because a CMA agreement represents a third choice, and one which violates the spirit and letter of the grazing statutes, the program is unlawful.

The original purpose of the CMA program was to allow selected permittees the opportunity to "manage livestock grazing on [their] allotment[s] as *they* determine appropriate." 48 Fed.Reg. at 21823 (proposed 43 C.F.R. § 4120.1) (emphasis supplied). Thus, any defense of the program begins on the shakiest of legs since the dominant message and command of defendants' Congressional mandate is that *defendants* shall prescribe the extent to which livestock grazing shall be conducted on the public lands. The apparent goal and inevitable result of the CMA program is to allow ranchers, for a term of at least ten years, to rule the range as they see fit with little or no governmental interference. Many of these ranchers may be fully qualified to prescribe their own management practices. Many are undoubtedly familiar, after years of ranching on the public lands,

with the Congressional mandate that public lands be managed "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values." 43 U.S.C. § 1701(a)(8). Some or all of these knowledgeable permittees may even be *inclined* to limit their livestock grazing to levels which will guarantee the vitality of such values, even at the expense of their own private ranching interests. Had Congress left a gap in its regulatory scheme which allowed defendants to decide whether individual ranchers should be entrusted with such decisions, this Court would be in no position to second guess the *wisdom* of the CMA program. However, Congress, in directing that the Secretary prescribe the extent of livestock practices on each allotment, precluded such entrustment, apparently because after years of rancher dominance of range decisions, it found substantial evidence of rangeland deterioration.

According to defendants' own Handbook Manual, CMAs *may* incorporate the objectives of an existing AMP, but *must* provide the permittee with special management flexibility. "Handbook," § .1(.11)(E), p. 2. Thus, any AMP which might be in existence when the CMA is signed retains no independent significance. The CMA itself need not be specially tailored to the allotment, and need not prescribe the extent to which livestock practices are conducted on the allotment. Thus, a decision by defendants to enter into a CMA with a permittee is plainly a decision by the Secretary and the BLM that an AMP need *not* be incorporated into the permit. 43 U.S.C. § 1752(e). Defendants are entitled to make such a determination, but Congress has instructed them that *"in all cases"* where an AMP is not incorporated, they "shall" specify in the permit "the numbers of animals to be grazed and the seasons of use..." *Id.* Defendants' assertion that the CMA regulation is valid because it requires specification of "performance standards" is without merit. The statute requires specification of numbers and seasons, not generalized

standards or responsibilities. CMAs, by definition and in practice, fail to comply with this Congressional mandate.

The CMA program would be without statutory support even if, as defendants argue, CMA permits were governed by § 1752(d) pertaining to AMPS rather than by § 1752(e). As plaintiffs point out, although the statute leaves the details of a particular AMP to the discretion of the Secretary,[39] "[a]n AMP is more, not less, detailed than a permit or lease." Reply Brief, p. 15. Congress, by defining AMPs as documents which "prescribe"[40] the extent to which livestock grazing may be conducted on public allotments, intended to reaffirm defendants' duty under the Taylor Grazing Act to specify numbers and seasons in each permit, whether issued pursuant to subsection (d) or subsection (e).[41] Thus, even if CMAs were a species of AMP, or required wholesale incorporation of AMPs (which would obviously defeat the purpose of the program) defendants would nevertheless be required to specifically limit the extent to which livestock grazing may be conducted on each allotment.[42]

*2. Duty to Reserve Revision and Cancellation Authority.* Defendants are also required to incorporate into each permit an express revocation or suspension clause, 43 U.S.C. § 1732(c), and must retain constant authority to "cancel, suspend, or modify" each permit "in whole or in part" for violations of permit or regulatory requirements. 43 U.S.C. § 1752(a). In permits without AMPs, such as those incorporating CMAs, defendants are required to specify in each permit that they "may reexamine the condition of the range at *any time*" and order whatever adjustments they deem appropriate. 43 U.S.C. § 1752(e) (emphasis supplied). Even permits incorporating AMPs must reserve authority for defendants to "revise or terminate such plans or develop new plans from time to time" after consultation with ranchers. 43 U.S.C. § 1752(d).

The CMA regulation and program falls far short of the standard set by Congress in FLPMA. While the rule, as promulgated, contains vague references to the BLM's authority to periodically evaluate the range, 43 C.F.R. § 4120.1(c), and to cancel or modify agreements under certain

---

suance requirements, it is unnecessary to reach the public participation issue.

**39.** Defendants cite language in a Congressional Committee Report suggesting that AMPs may "be as simple or as complex as circumstances warrant." H.Rep. No. 94–1163, 94th Cong., 2d Sess., at 13 (May 15, 1976), U.S.Code Cong. & Admin.News 1976, pp. 6175, 6187. The question, however, is not whether CMAs are too simple, but whether the Secretary may fail to expressly limit numbers and seasons in an AMP. Moreover, the language cited by defendants is from a committee which reported FLPMA *before* substantial amendments to the permit issuance provisions were enacted. Consequently, the committee language erroneously states that AMPs are required to be included "with each lease or permit." *Id.* Thus, it was important for the Committee to caution that AMPs could be "simple" documents.

**40.** *Webster's Third New International Dictionary* 1792 (unabridged 1976) defines the word "prescribe" as meaning "to lay down a rule." Defendants apparently believe that Congress may just as well have meant "describe" when it used the word "prescribe." It has been noted that "[t]he Alice-in-Wonderland view that something means whatever one chooses it to mean makes for enjoyable reading, but bad law." *Autogiro*

*Co. of America v. United States,* 384 F.2d 391, 397, 181 Ct.Cl. 55 (1967).

**41.** Persuasive on this point is the fact that defendants, prior to promulgation of the CMA regulation, have consistently maintained that the BLM "cannot abdicate its management responsibilities on the public lands" and is therefore "required to specify numbers of livestock" and "periods/seasons of use" on "all allotments." 43 Fed.Reg. 29059, 29060 (1978). It was this position taken by defendants immediately after passage of FLPMA which represents defendants' "contemporaneous construction" of the statute and which is therefore entitled to the greatest degree of judicial deference. *Alcoa v. Central Lincoln Peoples' Utility District,* 467 U.S. 380, ——, 104 S.Ct. 2472, 2480, 81 L.Ed.2d 301 (1984). Even defendants' 1984 Handbook Manual includes a provision that "all permits" which incorporate AMPs contain grazing prescriptions "in terms of the kind and numbers of livestock" and "periods of use." *"Handbook,"* § .2(.2)(.21)(J).

**42.** It is unnecessary in this opinion to determine the outer limits of flexibility which defendants may afford permittees operating under an AMP. Under these facts, the Secretary has authorized the BLM to prescribe *no* limit.

circumstances, § 4120.1(d), § 4170.1–4, the details of defendants' authority are left to the BLM's determination, and the BLM has determined to abdicate its authority in favor of secure rancher tenure.

The Handbook, which defendants concede has implemented the true intent of the Secretary's rule, sets up a range review schedule so lenient and favorable to ranchers, that permittees are virtually guaranteed a minimum ten years of uninterrupted self-management on each CMA allotment.

Five years after a CMA is executed, and not sooner, defendants must conduct a "joint evaluation" of the range to determine whether or not the agreement's "objectives" have been realized. "Handbook," § .1(.11)(F), p. 2. If, after a joint inspection, the BLM determines that objectives are being met, the rancher is entitled to a new ten year permit. *Id.* Assuming the worst, however, (i.e., that the rancher has failed to cooperate with the cooperative approach) the BLM is *not* empowered under the agreements to impose strict grazing guidelines for the remainder of the term. Nor may the BLM, under a CMA, cancel or suspend the rancher's permit. Rather, the BLM is expressly directed to allow "reasonable time" within which the rancher may comply "before the agreement terminates." *Id.* The only sanction available to the BLM against a rancher who allows the rangeland to deteriorate under his self-management is the discretionary refusal to renew the rancher's permit. *Id.* Cancellation is generally reserved for the separate offense of violating "terms and conditions" of CMAs which may be carefully written (and are in some CMAs) to omit any reference whatever to performance standards. *Id.*

Thus, for ten years, assuming only that the BLM complies with its CMA agreements and that certain rancher covenants which are unrelated to the condition of the public lands are fulfilled, CMA permittees are guaranteed secure tenure. This is not partial or substantial compliance with the permit issuance requirements of the grazing statutes—it is simple *non*compliance.

The statutes cannot be reasonably interpreted to allow defendants to tie their own hands with respect to their authority to modify, adjust, suspend, or cancel permits. Nor is there any statutory provision creating exceptions for "exemplary" ranchers or those grazing livestock on public lands which, in defendants' view, require no improvement. Permittees must be kept under a sufficiently real threat of cancellation or modification in order to adequately protect the public lands from overgrazing or other forms of mismanagement. Any other interpretation of Congressional intent is inconsistent with the dominant purposes expressed in the Taylor Grazing Act, FLPMA, and PRIA. *See* section II, *supra.* It is for Congress and not defendants to amend the grazing statutes. In the meantime, it is the public policy of the United States that the Secretary and the BLM, not the ranchers, shall retain final control and decisionmaking authority over livestock grazing practices on the public lands.

### · E.   Violation of the National Environmental Protection Act

▮ Plaintiffs alternatively contend, and the Court agrees, that defendants have violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, by failing to prepare an Environmental Impact Statement (EIS) prior to implementing the CMA program. Defendants maintain that their decision to forego preparation of an EIS was reasonable and based upon their specific finding that the new program would not "significantly affect[ ] the quality of the human environment." *See* 42 U.S.C. § 4332(2)(C).

Pursuant to regulations promulgated by the Council on Environmental Quality, 40 C.F.R. § 1501.4(b)(1984), defendants determined that the CMA program was not one which normally requires an EIS but neither was it categorically excluded from NEPA's environmental review process. Therefore, as required by regulation, defendants

drafted an Environmental Assessment (EA).[43]

Although several paragraphs were devoted to a discussion of the so-called "environmental consequences" of the proposed CMA program, the document was essentially a policy justification for the new program with little space devoted to consideration of the threatened environmental impacts which might result therefrom. In discussing the program's potential for degrading environmental impacts, defendants repeated a central theme: because CMA livestock operators would initially consist of only those ranchers with demonstrated stewardship abilities, there would be little chance that CMA operators might abuse their flexibility under the new agreements. However, defendants *measured* the ranchers' stewardship prowess *not* by a demonstrated ability or propensity to improve the range, but instead, by the fact that they were currently managing so-called "M" allotments (lands in relatively good condition).[44] Defendants stated no reason why they believed ranchers leasing lands which are currently in good condition will perform better under a new regime of self-management. Neither is it explained why there is a special need for defendants' hoped for "improvements" on the very lands categorized as not requiring improvement. If these lands have been managed properly, either by the current or former management, it has been under the existing inflexible regime.

Moreover, defendants acknowledged in the EA that operators of lands in *poor* condition will also become eligible for CMAs. Of course, the eligibility of operators on marginal lands substantially under-

cuts the purported logic of defendants' main environmental justification for the CMA program.

Defendants also discussed what they perceived to be the potential environmental benefits to ranchers and to the federal government from increased security of tenure for ranchers under CMAs. The EA is devoid, however, of any mention of or justification for defendants' relinquishment of their authority to cancel, suspend, or modify permits when overgrazing occurs. Rather, the document contains the conclusory statement that the program's lenient review process "will have no adverse impact" on the quality of the environment.

The EA acknowledges that serious environmental consequences might result from program abuse, but expresses the view that such abuse is "highly unlikely." The potential impacts, therefore, are nowhere described and there is no attempt whatever to quantify the degree of potential harm so that it may be weighed and balanced against the perceived risk of such harm coming to pass. In short, defendants simply did not take a hard look at the potential degrading environmental impacts which they conceded might result from program abuse.

NEPA is an exceptionally broad statute which mandates the preparation of an EIS prior to implementing "major Federal actions[45] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). The agency's decision to prepare an EIS is not a discretionary one: "[a]n EIS *must* be prepared for actions that may significantly affect the quality of

---

**43.** Document No. 221, "Environmental Assessment, Proposed Cooperative Management Agreement Program," April 29, 1983. The regulations define an EA as a "concise public document" which "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact" and one that serves to "[a]id an agency's compliance with [NEPA] when no [EIS] is necessary," or "[f]acilitate preparation of [an EIS] when one is necessary." The EA should discuss, *inter alia,* "the need for the proposal" and "the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9 (1984).

**44.** Defendants categorize the public grazing lands roughly as follows: (1) *"M" Allotments* (Maintain), those in good condition; (2) *"I" Allotments* (Improve), those which need and are capable of improvement; and (3) *"C" Allotments* (Custodial), those which by definition have little potential for improvement.

**45.** There is no dispute that the promulgation of the CMA program was a major federal action.

the human environment." *Foundation for North America Wild Sheep v. United States Dept. of Agriculture*, 681 F.2d 1172, 1177, n. 24 (9th Cir.1982). Unless unreasonable, an agency's determination *not* to require an EIS must be upheld, *id.* at 1177, but "[t]he spirit of the [NEPA] would die aborning if the facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review." *Id.* at 1182–83, *citing Save Our Ten Acres v. Kreger*, 472 F.2d 463, 466 (5th Cir.1973). Thus, the standard of review in this Circuit has been clearly outlined:

> The standard for determining whether the implementation of a proposal would significantly affect the quality of the human environment is whether "the plaintiff has alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor" [cites omitted]. A determination that significant effects on the human environment *will in fact occur* is not essential [cite omitted]. If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS *must* be prepared.

*Foundation*, 681 F.2d at 1177–1178 (emphasis in original).

Overgrazing by federal permittees has been a key culprit in the tragedy of our commonly owned lands. *See discussion, supra*, section II(B). The dangers of overgrazing and the fact of its historical occurrence, especially upon lands managed by the BLM, are abundantly documented. Congress has repeatedly found that overgrazing threatens the vitality of environmental and other values and has directed defendants to protect those values even if in protecting them defendants must sacrifice "the greatest economic return or the greatest [livestock] unit output." 43 U.S.C. § 1702(c) Defendants have conceded that the CMA program, particularly if abused, may cause serious overgrazing on the public lands. An agency must do more to avoid preparing an EIS under these circumstances than to merely express its view that the potential threat, although nationwide in scope, is "highly unlikely" to occur.

Plaintiffs have raised substantial concerns through argument and indications to a voluminous administrative record that the free rein allowed permittees under the CMA program presents a risk of abuses of privilege reminiscent of times past. Thus, promulgation of the CMA rule is a major federal action which may have a significant impact upon the quality of the human environment. Defendants' EA, and particularly its failure to address "crucial factors, consideration of which was essential to a truly informed decision"[46] renders its determination of no significant impact plainly unreasonable.

## IV. AMENDMENTS TO GRAZING REGULATIONS

### A. Dilution of Allotment Management Plans

The challenged regulations contain a revised vision of the scope and purpose of allotment management plans. See discussions, *supra*, sections II(C) and III(D). Under the former rules an AMP was required to "prescribe a system of grazing" on an allotment, and to contain so-called "mandatory terms and conditions" (including limitations on numbers and seasons of use, and provisions for cancellation, suspension, and modification). *See* 43 C.F.R. § 4120.2–3(a) (1983). The language requiring grazing "prescriptions" tracked the language used by Congress in defining AMPS. 43 U.S.C. § 1702(k).

By contrast, the 1984 regulations provide:

> The allotment management plan shall include terms and conditions under *§ 4130.6* of this title, and shall *describe* the livestock grazing practices necessary to meet specific multiple-use management objectives.

---

46. *Foundation*, 681 F.2d at 1178.

43 C.F.R. § 4120.2(a) (1984) (emphasis supplied). Consistent with the switch in the regulations from the term "prescribe" to "describe" is the subtle modification of the terms and conditions which must be incorporated into each completed AMP. While the former rules made clear that AMPs would contain mandatory terms and conditions, the new rule, 43 C.F.R. § 4120.2 (1984), guarantees only that AMPs shall include terms and conditions "under § 4130.6 of this title." Section 4130.6, curiously, lists only those terms and conditions "necessary to achieve the management objectives for the public lands," while the mandatory conditions are listed in a separate section of the rules. Thus, a common sense interpretation of the new regulation is that the BLM, in permits containing AMPs, is now free to omit "prescriptions" of livestock numbers, seasons of use and provisions authorizing cancellation, suspension, and modification.

█ Plaintiffs contend that the revision substantially dilutes the intended effectiveness of AMPs and is contrary to defendants' duties under the grazing statutes. Plaintiffs also attack the change on the ground that defendants failed to comply with the notice provisions of the APA, 5 U.S.C. § 553, *see discussion, supra,* section III(B). Because the Court agrees that defendants' failed to properly notice the revision, there is no need to pass judgment on the substantive legal challenge.

On May 13, 1983, defendants published the proposed modification with the following notice:

> Section 4120.2–3, [AMPs], would be redesignated as § 4120.2, [AMPs]. This section would also be revised *to eliminate redundancy* and to clarify that completed allotment management plans shall be incorporated into the terms and conditions of affected grazing permits and leases.

48 Fed.Reg. 21821 (May 13, 1983) (emphasis supplied). Given the actual impact of the new rule, the notice was patently misleading. A member of the public would be lulled into believing, by virtue of defendants' mischaracterization, that the change was designed only to "eliminate redundancy," when, in fact, a basic policy readjustment was underway.[47]

The APA requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register" and "shall include ... either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). Defendants' duties under the APA also entail giving "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). Whether the agency's notice is sufficient must be measured against the standard contemplated by Congress when it enacted Section 553:

> [a]gency notice must be sufficient to fairly apprise interested parties of the issues involved, so that they may present responsive data or argument related thereto."

S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945), *reprinted* in "Administrative Procedure Act: Legislative History," S.Doc. No. 248, 79th Cong., 2d Sess. 185, 200 (1946). Even where, as here, the technical terms of a proposed rule are published in the *Federal Register*, such facially sufficient notice is rendered inadequate by an agency's affirmative mischaracterization of its import

---

47. The Court has considered the possibility that the revision was merely the result of poor draftsmanship, and was not intended to substantively modify the necessary elements of AMPs. However, any such notion is dispelled upon examination of defendants' response to comments accompanying the final rulemaking. 49 Fed.Reg. 6445 (February 21, 1984). The change is therein defended on the ground that "[a]ll allotments do not require systematic grazing" and that a "description" of livestock practices (as opposed to a "prescription") was therefore "adequate for a quality AMP." Whether defendants' policy choice was appropriate is immaterial. What is plain, however, is that the revision, advertised as merely "eliminating redundancy" was intended to substantively change existing policy.

and impact.[48] That plaintiffs and other members of the public had inadequate "actual notice," 5 U.S.C. § 553(b), of the effect of the revision is manifested by the fact that the agency reported receiving no comments on the deletion of mandatory terms and conditions from AMPs. 49 Fed.Reg. 6445 (February 21, 1984).[49] For all of these reasons, plaintiffs are entitled to summary judgment on this issue.

### B. Dilution of Land Use Plans

The grazing statutes are unequivocal in their endorsement of the land use planning process as the basis and guide for all future livestock management decisions. *See* 43 U.S.C. § 1711(a) (defendants must conduct an inventory of all public land resources); *id.* § 1712 (defendants must prepare land use plans for all public land regions); *id.* § 1732 (defendants are *bound* by land use plans and shall manage the public lands "in accordance" with same); *id.* § 1901(b)(2) (defendants' duty to manage the public lands "in accordance with management objectives and the land use planning process" was affirmed in PRIA). The legislature's emphasis on the importance of land use planning caused the leading commentator to observe that Congress "intended planning to be the center-

piece of future rangeland management" and "binding on all subsequent multiple use decisions."[50]

Reflecting this mandate, the former regulations *required* BLM officers to modify, suspend, or cancel all permits which were inconsistent with governing land use plans. These sections were deleted in 1984.[51] The *new* section provides:

> Following careful and considered consultation, cooperation and coordination with the lessees, permittees, and other affected interests, the authorized officer *may modify* the terms and conditions of the permit or lease *if monitoring data show that present grazing use is not meeting the land use plan or management objectives.*

43 C.F.R. § 4130.6-3 (1984) (emphasis supplied). Thus, under the revised regulations there is no reference whatsoever to the Secretary's authority to *cancel* or *suspend* permits which are inconsistent with land use plans. Moreover, permits apparently may not even be *modified* under the new regulation unless monitoring data establishes the inconsistency.[52] Finally, and most fundamentally, the new regulation omitted the mandatory "shall" and replaced it with the discretionary "may" re-

---

**48.** Defendants assert that "[t]he provision's very language indicates that the defendants were considering a *new role* for an AMP, i.e., a 'descriptive' document rather than one that 'prescribes.'" Defendants' Opening Brief, p. 64 (emphasis supplied). Under such circumstances, they argue, "[t]he fact that the proposed rulemaking's preamble did not explain the possible impacts from the provision under consideration is of no consequence." *Id.* Defendants, however, miss the point. It is not the *absence* of language in the preamble which renders the notice misleading. Rather, it is the affirmative mischaracterization of the rule which *vitiates* the notice.

**49.** The Court's previous analysis of the CMA program's failure to prescribe mandatory terms and conditions, *see* discussion, *supra*, section III(B), makes it clear that the Secretary's dilution of AMPs, even if it had been properly noticed, could not withstand substantive scrutiny. The term "prescribe" in the grazing statutes, 43 U.S.C. § 1702(k), when read in conjunction with the Taylor Grazing Act, 43 U.S.C. § 315b, indicates Congressional intent that sea-

sons, numbers, and cancellation provisions be specified in all permits, including those containing AMPs.

**50.** *Coggins IV, supra,* note 18 at 15.

**51.** The following sections were eliminated by defendants from the regulations in 1984: (1) *43 C.F.R. § 4130.2(d)(3) (1983):* "Grazing permits or leases *shall* be modified, suspended, or cancelled as required by land use planning decisions" (emphasis supplied); (2) *43 C.F.R. § 4120.2-1(c)(1983):* "All permits and leases shall be made subject to cancellation, suspension, or modification, as required by land use plans, and subject to applicable law."

**52.** Plaintiffs point out that due to funding constraints, monitoring studies have not been conducted in many areas. Thus, the practical effect of requiring monitoring data is that, on many allotments, even the authority to *modify* inconsistent permits may be delayed or, worse, rendered irrelevant, by defendants' inability to obtain the necessary monitoring data required by the new regulation.

versing defendants' policy of maintaining substantial consistency between plans and permits.

Because the Court agrees that the new policy was no-where explained or justified in the publication of the final rulemaking, it is unnecessary to resolve the questions of Congressional intent raised by plaintiffs. *See* discussion of 5 U.S.C. § 553(c), *supra,* section III(B).

Defendants received several highly critical comments on the change in the role of land use planning. The BLM's California Director, fearing the proposed regulation was contrary to law, pointed out that the elimination of provisions allowing cancellation of permits "strongly implies that no grazing permits ... will be cancelled prior to their expiration" except for specific violations of regulations or permit conditions. *See also* Comments of N.R.D.C., Inc., August 10, 1983 at 24–25, Document No. 20 (defendants were warned that the revision might conflict with applicable law insofar as land use plans would no longer modify current practice or control future grazing decisions).

Most significantly, defendants' attention was directed during notice and comment to their own contrary legal position enunciated only a year before this proposal came to light. *See* discussion of *Motor Vehicles Mfrs., infra,* section IV(D). In 1982, defendants *rejected* a similar proposal to replace the word "shall" with the word "may" (while leaving in the regulation full authority to cancel or suspend inconsistent permits) on the ground that where changes in grazing permits "are required by land use planning, *the Bureau's authority is non-discretionary."* 47 Fed.Reg. 41702, 41706 (1982) (emphasis supplied). *See* Comments of the National Wildlife Federation, August 11, 1983, at 12, Document No. 15, (alerting defendants to the inconsistent legal positions). Defendants were, therefore, aware that the new regulation was a radical departure from past practice. Defendants had shifted from an unwillingness to even make the obligation to modify, suspend, or cancel permits optional, to the about-face posture of proposing a far more sweeping dilution of the role of land use planning.

Despite the sweep of the new proposal, the level of criticism received, and the 180–degree policy turn, defendants limited their statement of basis and purpose to the following paragraph:

A number of comments were received recommending retention of § 4120.2–1(c) which was proposed for deletion. Comments recommended retention to make it clear that under law, permits and leases are subject to land use plans and can be cancelled or modified. In the final rulemaking, § 4130.6–3 was added to provide for modification of permits and leases to meet the objectives of a land use plan allotment.

49 Fed.Reg. 6444 (February 21, 1984). If defendants' policy direction took a 180–degree turn, this statement provided 360–degrees of circular reasoning and no degree of explanation or justification. Absent from the statement is any response to objections to the elimination of authority to cancel or suspend permits when required by land use planning. Defendants' thinking regarding the wisdom of a discretionary rather than mandatory duty to maintain consistency between plans and permits is omitted. There is not a word spent explaining the need for monitoring data before action may be taken. Finally, there is evasion of *the fact,* not to mention explanation of the fact, that before promulgating this regulation defendants had perceived such a modification to be illegal.

Plaintiffs are entitled, therefore, to summary judgment on their APA claim regarding defendants' regulatory dilution of the role of land use plans in grazing administration. *See* 5 U.S.C. § 553(c).

## C. Operator Penalties

Plaintiffs' next challenge is to defendants' deletion of provisions that penalized livestock operators who violated federal or state environmental laws, including those relating to air, water, wildlife, plant,

fish, and wild horse and burro protection, and the use of chemical toxicants.[53]

There is no allegation that defendants were without authority to delete these penalties. But plaintiffs contend, and the Court agrees, that defendants again ignored the requirements of the APA by failing to respond to comments or otherwise explain the basis and purpose of an important policy reversal. 5 U.S.C. § 553(c). *See* discussion of *Motor Vehicles Mfrs., infra,* section IV(D).

Commenters articulated numerous reasons for retaining the penalties: the rule had deterred persistent violators of environmental laws; the rule was necessary to prevent harassment of wildlife and wild horses and burros; there was simply no articulated reason to allow violators of state and federal laws to go unpunished for violations of environmental laws.[54] The ultimate merit of the comments aside, defendants were faced with well-reasoned policy objections to the proposed amendment.

In the final rulemaking, defendants modified the proposed amendment by indicating that penalties would still be available for violations of the Bald Eagle Protection Act (16 U.S.C. § 668) and the Endangered Species Act (16 U.S.C. § 1540) but not for

violation of the other environmental statutes deleted from coverage. 49 Fed.Reg. 6440. The only rationale for inclusion of these statutes and deletion of the remainder was contained in defendants' assertion that only the *included* Acts "specifically provide [penal] authority to the Secretary." *Id.* Giving the Secretary the benefit of any doubt, it is nevertheless impossible to construe this statement as a response, justification, or explanation of defendants' change in policy. The Court can imagine no legal argument, and none has been presented in this motion, that the Secretary of the Interior requires separate legal authority to cancel or modify grazing permits following a permittee's violation of laws which are clearly related to grazing management goals set by Congress. Nor has the Secretary responded at all to the numerous policy objections to the amendment. Plaintiffs are therefore entitled to summary judgment on this issue.

### D. The Supplemental Feeding Amendment

The Secretary's final rulemaking enabled ranchers for the first time to use supplemental feeding techniques[55] on their allotments without prior BLM authorization.[56]

---

**53.** 43 C.F.R. §§ 4140.1(b)(7) and (8)(1983), prior to these amendments, provided:

> Persons performing the following prohibited acts may be subject to civil and criminal penalties under §§ 4170.1 and 4170.2:
>
> . . . . .
>
> (7) Violating any provision of Part 4700 of this subchapter concerning the protection and management of wild free-roaming horses and burros;
> (8) Violating any Federal or State laws or regulations concerning conservation or protection of natural and cultural resources or the environment including, but not limited to, those relating to air and water quality, protection of fish and wildlife, plants, and the use of chemical toxicants;

Defendants had previously retained these provisions with the explanation that "in some instances violation of these laws and regulations indicates that a permittee or lessee has insufficient regard for the public lands and their resources to warrant continuation of his preference." 42 Fed.Reg. 35334, 35335 (1977); *See also* 43 Fed.Reg. at 29061.

**54.** *See* comments of Montana Audobon Council, at 1 (August 8, 1983), Document No. 36; comments of Sierra Club, Rocky Mountain Chapter, at 2 (July 11, 1983), Document No. 121; comments of Curtis Spalding at 2 (July 8, 1983), Document No. 126; comments of U.S. Fish and Wildlife Service (July 21, 1983), Document No. 99; and comments of National Wildlife Federation, at 14 (August 11, 1983), Document No. 15.

**55.** Supplemental feeding is the practice of adding food to the diet of livestock which is not naturally available on the public lands. Ranchers sometimes employ supplemental feeding techniques to improve livestock nutrition or alter rangeland management. *See* 43 C.F.R. § 4100.0–5 (1985).

**56.** In 1983, the regulations prohibited supplemental feeding on the public lands "without authorization." 43 C.F.R. § 4140.1(a)(3)(1983). The 1984 modification to the regulations removed the words "without authorization" and replaced them with the words "in violation of the lease or permit." 49 Fed.Reg. 6454.

Plaintiffs attack the change because: (1) defendants failed to adequately explain the basis and purpose of the revision; and (2) defendants failed to order a necessary environmental impact statement.

▆▆▆▆ *1. Statement of Basis and Purpose.* The first inquiry requires the Court to determine whether the Secretary's response to comments on the supplemental feeding modification was sufficient to explain how defendants resolved significant problems raised by the commenters, and sufficient to indicate that the decision was based upon a consideration of relevant factors. 5 U.S.C. § 553(c), *see, supra,* section III(B). The modification was challenged by commenters on two principal grounds: (1) that the easing of restrictions on supplemental feeding removed necessary environmental safeguards,[57] and (2) that the BLM lacked administrative resources to properly control abuse of the new rule or to reissue permits with restrictions on supplemental feeding practices.[58]

Defendants responded as follows:

The comments suggested that there could be significant impact from supplemental feeding without [BLM] being aware and the Bureau would not have the administrative resources necessary to modify a large number of permits. After consideration of these comments, the Department has adopted the proposed provision in the final rulemaking. Authority to modify a permit or lease to prohibit supplemental feeding ... is provided for in §§ 4130.6–3 and 4110.3(c). However, such actions should be based on local resource conditions and not apply bureauwide. The Bureau Manual will provide proper procedures for the authorized officer to manage supplemental feeding.

49 Fed.Reg. 6447–6448 (February 21, 1984).

The modification represented a reversal of the Secretary's longstanding position on supplemental feeding on the public lands. Therefore, the Supreme Court's warning in *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), must be heeded:

the revocation of an extant regulation is substantially different than a failure to act. Revocation constitutes a reversal of the agency's former views as to the proper course. A "settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to. [citations omitted] Accordingly, an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.

Judged by this standard, defendants' explanation of the supplemental feeding modification was grossly inadequate in light of the critical comments received. Absent from the response is any rationale or explanation whatsoever respecting the relevant factors raised in the comments. Rather than explaining why administrative resources would be sufficient under the new rule, or why defendants believed that the benefits of the new rule outweighed the threatened environmental impact, the response merely reaffirmed defendants' posi-

---

**57.** *See* Comments of N.R.D.C., Inc., Document No. 20, August 10, 1983.

**58.** Of particular significance were comments by Montana State Director, BLM, July 22, 1983, Document No. 95: "Under these proposed regulations, permittees/lessees would be authorized to supplementally feed anything they desired at any place on the public land[s] unless BLM specifically stipulated the conditions under which they could supplementally feed. Since we [BLM] do not have the manpower to cancel and reissue grazing permits with stipulations concerning supplemental feeding, this would [have] the practical effect of allowing permittees to feed hay containing noxious weeds or poisonous plants, feed[ ] in riparian areas or crucial wildlife habitat areas, or any number of other problems. From a resource protection standpoint, we need the authority to direct the timing, kind and placement of supplemental feeding currently in the grazing regulations."

tion that the modification should be implemented.

■■■ *2. The NEPA Challenge.* Assuming the Court were to rule that defendants' statement of basis and purpose was sufficient, the supplemental feeding rule would have to be stricken because of the Secretary's failure to order an Environmental Impact Statement. *See supra,* section III(E), discussing the National Environmental Protection Act (NEPA). Defendants, of course, were required to prepare an Environmental Impact Statement (EIS) for the supplemental feeding policy unless they reasonably concluded that the new rule was not a major federal action which might significantly degrade some human environmental factor. *Foundation for North American Wild Sheep v. Dept. of Agriculture,* 681 F.2d at 1177–1178.

Relying on an internal Environmental Assessment (EA),[59] defendants made a finding of no significant impact. *See* 40 C.F.R. § 1508.9(a)(1). Acknowledging that the change would "allow the livestock operators to use supplemental feeding without seeking prior approval" and that such a change "could have slight adverse environmental impacts" if abused, defendants nevertheless dismissed the possible impacts as being of probable "short duration" and fully controllable under careful inspections and supervision by BLM officers in the field. *"The EA,",* pp. 6–7, § IV(j). The EA also expressed the hope that BLM field offices would address the problems of supplemental feeding in area monitoring plans and would develop site-specific environmental assessments. *Id.* at 7, § V(c).

Although defendants nowhere indicate so in the EA or in any other public document brought to this Court's attention, the official lack of concern over the possible environmental impacts of supplemental feeding was an abrupt reversal of past expressions of policy. In 1978 defendants commented on supplemental feeding practices in the Federal Register:

> the Bureau ... recognizes that supplemental feeding, unless properly controlled, tends to concentrate livestock. This may damage the basic vegetative-soil resources and must be prevented.... Placement of supplements also can affect other resource values such as archaeological sites, critical wildlife areas, etc., and must be controlled to reduce their impacts.

43 Fed.Reg. 29059 (July 5, 1978). While defendants certainly have the right to change their minds about the ultimate wisdom of the supplemental feeding restrictions, these past findings of potentially devastating impacts on the environment raise serious questions about the legitimacy of their more recent finding of no significant impact. The EA fails to address the formerly identified dangers of overconcentration of livestock or misplacement ·of feed. While conceding the potential for some impact, the assessment failed to discuss what that impact might be. Rather, there is merely the naked conclusion that the impact will be of "short duration."

The EA is insufficient for another reason. During notice and comment, staff and public alike warned that the BLM's administrative resources were inadequate to carefully monitor the placement of supplemental feed at the area, district, or allotment level. Rather than addressing this potential shortcoming of the plan, defendants glossed over it and *recommended* careful monitoring at the local level.[60]

Given the BLM's limited administrative resources and its previous findings of potential environmental impact, it was unreasonable to conclude that allowing permittees nationwide the freedom to place supplemental feed on the public lands without

---

**59.** *See* Document No. 166, entitled "Environmental Assessment for Proposed Amendments to C.F.R. Part 4100, Grazing Administration Regulations," April 20, 1983 (hereinafter "the EA").

**60.** The EA, of course, *preceded* notice and comment. Thus, with the exception of defendants' cursory statement of basis and purpose, defendants never prepared an EA which responded to the major comments on the proposed amendments, including the warnings of inadequate administrative resources.

prior government approval was not a major action which may significantly impair the quality of the human environment. Plaintiffs are therefore entitled to summary judgment on this issue.[61]

### E. New Definition of "Affected Interests"

■ The only members of the public who may generally participate with defendants in day-to-day grazing decisionmaking are those denominated "affected interests." *See, e.g.,* 43 C.F.R. §§ 4110.3–3, 4120.2(a), 4160.1–1, 4160.2 and 4160.3(b) (1984). Prior to the 1984 regulations, defendants defined "affected interests" as follows:

> any individual or organization who has been identified by the authorized officer as being *potentially* affected by a proposed action *or* who has expressed, in writing to the authorized officer, concern for the management of livestock grazing on specific grazing allotments. *In addition to grazing permittees and lessees, such interests may include, for example, State officials, intermingled land owners, and wildlife or conservation representatives.*

43 C.F.R. § 4100.0–5 (1982) (emphasis supplied). The new rule contains a substantially less generous standard.[62] In substance, defendants have removed the word "potentially" from the definition, replaced the word "or" with the word "and," and

eliminated the final sentence of the former definition. Thus, in addition to expressing concern in writing, a member of the public must now also be *designated* an "affected interest" by a BLM officer before being permitted to participate in livestock management decisions.

Plaintiffs contend that this modification was inadequately noticed, 5 U.S.C. § 553(b), and that it violates the public participation requirements of the grazing statutes.

Defendants published the following notice of the proposed revision in the Federal Register on May 13, 1985:

> Section 4100.0–5 is amended by:
>
> a. Amending the definition of "affected interest" by removing the work [sic] "potentially" where is [sic] appears and by removing the word "or" after the words "proposed action" where it appears, inserting the word "and" and removing all of the sentences after the first sentence.

48 Fed.Reg. 21822 (May 13, 1983). Thus, defendants' proposed amendment did not differ materially from the amendment finally adopted and its impact was self-explanatory.[63] Consequently the Court finds that the rule properly apprised the general public of the matter under consideration.

■ Plaintiffs also point to the FLPMA provision directing the Secretary to "estab-

---

**61.** Objections are also raised to the EAs prepared in lieu of impact statements for several other regulatory amendments. In particular, plaintiffs challenge the deletion of 43 C.F.R. §§ 4110.3–2(d)(2) and (3), and 4160.3(e)(1983) and the enactment of 43 C.F.R. § 4110.3–3 (1984). Plaintiffs' challenges do not merit discussion. Defendants maintain that these sections represent no change in policy and plaintiffs have failed to rebut the assertion with any evidence. Defendants are, therefore, entitled to summary judgment with respect to these regulations.

**62.** The new definition of "affected interest" is: "an individual or organization that has expressed in writing to the authorized officer concern for the management of livestock grazing on specific grazing allotments *and* who has been determined by the authorized officer to be an affected interest." 43 C.F.R. § 4100.0–5

(1984), 49 Fed.Reg. 6440 (February 21, 1984) (emphasis supplied).

**63.** *The preamble to the proposed rules contains a somewhat misleading explanation of the amendments to definitions. Defendants state therein that "[t]he proposed rulemaking would also revise 11 definitions, generally to clarify them." 48 Fed.Reg. 21820 (May 13, 1983). Certainly, the new definition of "affected interest" is more than a mere clarification. However, the statement in the preamble is not an affirmative mischaracterization of the change since it was cast in terms applicable to all eleven amendments "generally" and, as such, would not be taken to mean that each and every amendment was a mere clarification of existing policy. Nevertheless, plaintiffs' concern that defendants demonstrated a general lack of candor in their notice is not entirely without justification.*

lish procedures ... to give [government officials] and the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1739(e); *see also* 43 U.S.C. § 1712(f). The contention is that the new definition of "affected interest" substantively violates Congressional intent by improperly narrowing public participation rather than expanding it as FLPMA mandates.

While the new definition obviously reflects a new reluctance on the part of the Secretary with respect to public participation, no evidence has been proffered which indicates that BLM officers have actually abused their discretion by excluding members of the public or governmental representatives who are entitled to participate. In the Court's view, therefore, a decision on the merits should be withheld at this time since a ruling would be premature and would merely entangle the Court in an abstract disagreement over administrative policy.[64] Unless and until defendants impermissibly prevent public participation in livestock management decision-making pursuant to their new regulations, there is simply no ripe controversy to be decided. Defendants are therefore entitled to summary judgment on the issue of the "affected interest" definition.

## V.  CONCLUSION

The problems facing defendants in managing the public lands are gigantic. While the Court has noted that livestock grazing policy and politics have often involved conflicting interests butting heads on the western range, it is obvious that no such simplistic analysis tells the whole story. It is true that private business and ranching values are sometimes in basic conflict with environmental quality and other societal values. But nothing in this opinion should be construed as a finding by this Court that defendants have consciously compromised one set of values in favor of another. Rather, the assumption throughout has been that defendants and plaintiffs merely possess opposing views as to the best way to strike a proper balance between competing interests.

Moreover, the Court recognizes that Congress has left most grazing management judgments to the discretion of defendants. Therefore, the Court has only interposed a third viewpoint in those instances where Congress has already spoken clearly on the subject over which defendants and plaintiffs debate.

Accordingly, and good cause appearing therefor,

IT IS HEREBY ORDERED that defendants' motion for summary judgment is DENIED and plaintiffs' motion for summary judgment is GRANTED insofar as permanent injunctive relief is sought to prohibit defendants from implementing the following grazing regulations: (1) *The Cooperative Management Agreement Program*, 43 C.F.R. §§ 4120.1 and 4170.1–4(1984); (2) *The Dilution of Allotment Management Plans*, 43 C.F.R. § 4120.2(1984) and the deletion of 43 C.F.R. § 4120.2–3(a); (3) *The Supplemental Feeding Amendment*, 43 C.F.R. § 4140.1(a)(3)(1984) and the deletion of 43 C.F.R. § 4140.1(a)(3)(1983); (4) *The Land Use Planning Amendment*, 43 C.F.R. § 4130.6–3(1984) and the deletion of 43 C.F.R. §§ 4120.2–1(c) and 4130.-2(d)(3)(1983); and (5) *The Operator Penalty Amendments*, deletion of 43 C.F.R. §§ 4140.1(b)(7) and (8)(1983).

IT IS FURTHER ORDERED that in all other respects and regarding all other challenged grazing regulations not listed above, whether or not specifically cited or discussed in this opinion, plaintiffs' motion for summary judgment is DENIED and defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

**64.** *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).